UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

KIMBERLY BEELER,                                                    Plaintiff,

v.                                              Civil Action No. 3:17-cv-573-DJH-RSE

NORTON HEALTHCARE, INC.,                                            Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Kimberly Beeler alleges that Defendant Norton Healthcare, Inc. retaliated against her for making good-faith complaints of discrimination to Norton's Human Resources Department, and to the Equal Employment Opportunity Commission. (Docket No. 41, PageID # 404) Beeler further alleges that Norton discriminated against her due to her age and gender in violation of state and federal law. (D.N. 1-1, PageID # 14) Norton moves for summary judgment as to all of Beeler's claims. (D.N. 36) For the reasons explained below, Norton's motion for summary judgment will be granted in part and denied in part.

## I.

Beeler, a 53-year-old woman, began her employment at Norton in 2011 as a Senior Storage Administrator. (D.N. 36-3, PageID # 290) As a Senior Storage Administrator, Beeler was a member of the Information Systems department. (D.N. 36-4, PageID # 295) Norton's storage infrastructure "houses and supports all of Norton's critical electronic systems such as payroll, accounts payable, time-keeping, clinical applications, online charting systems, and lab-based applications," and the Storage group "is essentially responsible for monitoring the I.S. storage environment to ensure that the system has enough storage capacity to support and maintain all of Norton's critical operating systems without interruption." (*Id.* PageID # 296) Although Beeler

1

was considered a Senior Storage Administrator by the company, she was put in the role of a "Backup and Restore Administrator" for the first several years of her employment at Norton. (D.N. 41-2, PageID # 417)

At the time of Beeler's hire, she was 41 years of age. (D.N. 36-3, PageID # 290) In October 2015, Michael Knapper, who was 39, became the Supervisor of I.S. Operations and began directly supervising Beeler. (D.N. 36-4, PageID # 295) Knapper reported to Brian McCarthy, the Director of I.S. Operations and Support Services. (D.N. 36-1, PageID # 193; D.N. 36-3, PageID # 291) In his declaration, Knapper said that Beeler "expressed dissatisfaction . . . regarding her previous role and responsibilities in the I.S. Storage group" and a "desire[] to become more involved in the group" during one of their first meetings together. (D.N. 36-4, PageID # 296) Knapper said that he reassured Beeler that she was an "integral member" of the group and told her that he expected "all members of [his] group to be capable of working with all systems and technologies and performing all of the essential duties of their job[s]." (*Id.*) In her affidavit, Beeler stated that she explained to Knapper that "it had been four years since [she] had been able to work on the systems and that [her] skills were not sharp enough to work on some of the systems." (D.N. 41-2, PageID # 417) Beeler further stated that Knapper, McCarthy, and Mark Mousette promised to get her the training she requested and "to get [her] up to speed so that [she] could finally be able to perform in the role that [she] was hired for." (*Id.*, PageID # 418)

According to Knapper's declaration, Beeler's training was designed to help her master the system and to prepare her to obtain certification on new systems, but Beeler never obtained those certifications. (D.N. 36-4, PageID # 296-97) Beeler testified in her deposition, however, that Norton failed to provide the additional training as promised. (D.N. 36-2, PageID # 244) According to Beeler, "the little bit of training [she received] was not near enough to cover what [she] needed

to catch up." (*Id.*) Beeler said that some of the training was held during work hours while she was still expected to answer phone calls and emails, as well as work on incoming request tickets, keeping her distracted and unable to focus on the classes. (*Id.*) Beeler went on to explain that she continued to have routine job tickets that would come in which "would compromise about 95% of [her] [eight]-hour work day. (*Id.*)

Beeler's affidavit stated that in May 2016, Knapper provided Beeler a written coaching for the first time regarding certain tickets. (D.N. 41-2, PageID # 418) Beeler said she reminded Knapper at that time that she still needed training that she had not yet received. (*Id.*) The employee-coaching record—dated May 31, 2016—stated that Beeler failed to acknowledge a ticket that was assigned to her. (D.N. 36-2, PageID # 262) A written comment was included, stating that this was the first ticket that Knapper and Beeler had an extended conversation about. (*Id.*) In his declaration, Knapper said that Beeler "consistently missed deadlines set to ensure timely implementation of a new program, resisted feedback from [Knapper] and training opportunities with her co-workers, and shifted the blame for her shortcomings to Norton vendors and/or her co-workers." (D.N. 36-4, PageID # 297) Knapper said that Beeler also refused to use effectively a project-management tool, Asana, to manage and track her projects. (*Id.*)

In his declaration, Knapper said that he issued Beeler a Performance Evaluation providing an overall rating of "not meeting the requirements of her position" for the 2015 review period due to her deficiencies. (*Id.*) According to Beeler's affidavit, the contents of the performance review were "more of the same bias" that she had already noticed. (D.N. 41-2, PageID # 419) The Performance Evaluation, dated June 27, 2016, indicated that Beeler did not meet five out of the

seven competency categories. [1] (D.N. 36-2, PageID # 265-66) Beeler also received a total score of 53.82% out of a possible 100. (*Id.*, PageID # 268) Beeler disagreed with the evaluation, writing in the employee-comments section that the evaluation "ma[de] it sound like [she] dropped the ball, ignored assignments, etc. which is simply not true." (*Id.*, PageID # 269) Beeler testified that she then brought her complaints about Knapper to Craig "[j]ust before [she] got put on the personal improvement plan." (*Id.*, PageID # 251) Beeler said that she believes the meeting was "[p]robably a month before[,]" but that she was not exactly sure of the date. (*Id.*) When asked whether the meeting occurred in July 2016, Beeler testified, "Somewhere around there. I don't know." [2] (*Id.*)

[1] In Norton's motion for summary judgment, it states that Knapper issued Beeler a Performance Evaluation on July 25, 2016, giving her an overall rating of "not meeting the requirements of her position." (D.N. 36-1, PageID # 196) Norton also said that the evaluation occurred on July 25 in its letter to the EEOC. (D.N. 41-6, PageID # 440) However, the actual Performance Evaluation attached as an exhibit to Beeler's deposition says that it was submitted June 27, 2016, and acknowledged by Beeler on June 28, 2016. (D.N. 36-2, PageID # 263) Based on the above, the Court finds that concluding that the Performance Evaluation at issue actually occurred on June 27, 2016, is consistent with the context provided in the record. Regardless, as will be explained below, the inconsistency does not alter the Court's conclusion.

[2] Norton argues that "the dates and details of Beeler's report of discrimination in her deposition and affidavit conflict." (D.N. 44, PageID # 477) Parties cannot create genuine issues of material fact through affidavits that (1) are "merely conclusory reiterations of the allegations of the complaint and which are not made on personal knowledge" or (2) "contradict their own depositions." *Tiller v. 84 Lumber Co.*, No. 88-2164, 1989 U.S. App. LEXIS 15558, at *10 (6th Cir. Oct. 10, 1989) (internal quotations and citations omitted). It is true that Beeler testified that her meeting with Craig happened "just before" she was placed on a Performance Improvement Plan (D.N. 36-2, PageID # 251), but later stated in her affidavit that she met with Craig after calming herself down following her August 5, 2016, meeting with Knapper (D.N. 41-2, PageID # 419). Although this is not a direct contradiction, Beeler's more recent precision in her affidavit is inconsistent with her deposition testimony. And Beeler provides no explanation for the inconsistency. Thus, Beeler cannot use the affidavit to create a factual dispute as to the date of her first meeting with Craig. *Tiller*, 1989 U.S. App. LEXIS 15558, at *10. Accordingly, the Court will rely on her deposition testimony for the timing of the meeting. *See Jackson v. Ohio Dep't of Rehab. & Corr.*, No. 3:08 CV 1911, 2010 U.S. Dist. LEXIS 81501, at *5 (N.D. Ohio July 2, 2010) ("Normally, inconsistent summary judgment affidavits cannot supersede prior deposition testimony." (citation omitted)). As with the date of the performance evaluation, the inconsistency does not alter the Court's conclusion.

Beeler testified that she told Craig during their July 2016 meeting that she believed she was being singled out for harassment and unfair treatment by Knapper because of her age and her gender. (*Id.*, PageID # 251-52) In her affidavit, Beeler says that she told Craig she "felt dehumanized by Knapper's treatment . . . and that [she] was afraid [Knapper] was trying to find a reason to fire [her] or else harass [her] until [she] quit." (D.N. 41-2, PageID # 419) When asked whether she provided any details to Craig, Beeler testified that she was "sure [she] did," but that she couldn't remember the exact conversation. (D.N. 36-2, PageID # 256) According to Beeler's affidavit, co-workers Dave Facktor and Mark Tinal told Beeler that Knapper had expressed concern that Beeler had complained about him to Norton's Human Resources Department on the same day as Beeler's meeting with Craig. (D.N. 41-2, PageID # 419)

Knapper—in consultation with McCarthy and Craig—placed Beeler on a 60-day Performance Improvement Plan, which Knapper explained was standard procedure "for employees who are rated as not meeting expectations on annual performance evaluations." (D.N. 36-4, PageID # 297) Beeler's PIP was scheduled to begin on August 9, 2016, and continue until October 11, 2016. (D.N. 36-2, PageID # 270) In her affidavit, Beeler said that she told Craig that she objected to being placed on a PIP. (D.N. 41-2, PageID # 419) Beeler testified that she objected to the PIP because a "lot of it was fabricated, [and] a lot of it was splitting hairs . . . . Anything to add more criticism to [her] work performance." (D.N. 36-2, PageID # 243) Craig stated in her declaration that Beeler never complained to her prior to being placed on a PIP about being treated differently due to her age or gender or for reporting disparate treatment. (D.N. 36-5, PageID # 340) According to Craig's declaration, the only time Beeler complained of differing treatment based on her age or gender was during her last PIP follow-up meeting on or about October 11, 2016. (*Id.*)

In his declaration, Knapper said that "[t]he purpose of the PIP was to help define and expressly articulate clear and concrete goals that . . . Beeler needed to achieve to be successful in her role." (D.N. 36-4, PageID # 297) The PIP itself stated that it included "specific areas in which [Beeler] [wa]s required to show improvement and to show the ability to independently perform the duties of her job." (D.N. 36-2, PageID # 270) The PIP then included three pages of tasks to be completed. (*Id.*, PageID # 271-73) The plan directed Beeler to contact Knapper directly if she had any questions or required assistance, and it stated that Knapper would provide any assistance within his ability. (*Id.*, PageID # 270) It also explained that if help from the Storage or Engineering teams was needed, Knapper would assign a resource to assist. (*Id.*) The plan stated that Beeler should not seek assistance from those teams unless Knapper specifically assigned a resource, and that failure to meet the improvement goals could result in Beeler's removal from her Storage position. (*Id.*)

As part of the PIP, Beeler was scheduled to meet with Knapper on a weekly basis beginning August 16, 2016, to review her progress with the plan. (*Id.*) During these meetings, Knapper would note areas in which Beeler had improved, as well as highlighting areas in which improvement was still needed. (D.N. 36-2, PageID # 274-87) In his declaration, Knapper said that he felt as though Beeler refused to meaningfully participate in the PIP meetings and would instead "simply state that she did not agree with the PIP and/or question [Knapper] as to why such regular meetings were necessary." (D.N. 36-4, PageID # 298) Beeler voiced her disagreement with Knapper's assessment of her during their weekly meetings. (*See* D.N. 36-2, PageID # 280, 283, 285) Knapper stated in his declaration that although he routinely asked Beeler at the end of each meeting "what, if anything, [he] could do to assist her in performing her daily duties and completing the PIP," she rarely had questions. (D.N. 36-4, PageID # 298) According to Knapper,

Beeler simply failed to successfully complete the objectives outlined in the PIP despite regular meetings and counseling. (*Id.*) He stated that Beeler "continued to miss deadlines and demonstrate a lack of motivation and [lack] of the technical skills needed to accomplish her daily tasks," as well as failing "to effectively communicate the status of ongoing projects and seek assistance." (*Id.*)

According to Beeler's affidavit, however, due to the "the constant volume of daily tickets, and the new prohibition on asking for team help," she "faced a PIP that no person could reasonably accomplish." (D.N. 41-2, PageID # 421) Beeler says she expressed this concern to Craig and Knapper, but with no meaningful response. (*Id.*) Beeler explained that as the PIP administration went on, she began to believe that Craig did not intend to help her, despite her complaints. (*Id.*, PageID # 422) Beeler said that Craig would not ask "for [her] feedback or seem to care whether [she] had what [she] needed to achieve the goals." (*Id.*)

In her declaration, Craig said that she was only aware of Beeler's complaint in 2014 and her complaint on October 11, 2016. (D.N. 36-5, PageID # 339-40) Craig explained that Beeler raised concerns to the Human Resources Department in 2014 "about interoffice conflict with members in the department in which she worked, [the] Information Systems" department. (*Id.*, PageID # 339) Craig said that Beeler did not report any additional concerns or complain of being treated differently based on her age or gender until October 11, 2016, "after [Beeler] was informed that she did not successfully meet any of the goals outlined in her performance improvement plan." (*Id.*) Craig had previously testified in a different case that when an employee reported that they did not trust their supervisor or thought they were not being treated as fairly as other staff members, Craig would normally conduct an investigation into the employee's complaints. (D.N. 41-8,

PageID # 455)  Craig explained that this was basic protocol.  (*Id.*)  There is no evidence in the record as to whether Norton conducted an investigation into Beeler's complaints.[3]

With input from McCarthy and Craig, Knapper removed Beeler from her Senior Storage Administrator role on October 4, 2016.  (D.N. 36-3, PageID # 290; D.N. 36-4, PageID # 298)  Beeler was then placed on job-placement leave, which allowed her until December 2, 2016, to find an alternate position within the organization.  (D.N. 36-3, PageID # 290)  Jessica Sivert, an Employee Relations Manager at Norton, stated that there were "[n]umerous positions" available in the I.S. Department at the time Beeler was placed on job-placement leave.  (*Id.*)  Beeler confirmed in her deposition testimony that she did not apply for any other positions at Norton and did not apply to be transferred anywhere within the company.  (D.N. 36-2, PageID # 220)  Beeler explained that anything in IT would have been under the same director and the same supervisors, and Beeler "did not want to work under any of them given the way [she had] been treated" during her time there.  (*Id.*)  Norton terminated Beeler's employment on or about December 2, 2016.  (D.N. 36-3, PageID # 290)

Beeler filed a Charge of Discrimination with the EEOC on September 19, 2016.  (D.N. 41-7, PageID # 447)  Norton received a Charge from the EEOC dated September 28, 2016.  (D.N. 36-3, PageID # 289)  The Charge was addressed to the Director of Human Resources, who was on

---

[3] Norton maintains that its counsel served Beeler's counsel with a privilege log on November 7, 2018, that included documents related to Beeler's Equal Employment Opportunity Commission charge.  (D.N. 44, PageID # 485)  Norton contends, however, that these documents are protected from disclosure by attorney-client privilege and/or the work-product doctrine and did not need to be produced.  (*Id.*)  Norton argues that its position statement to the EEOC is evidence of an investigation conducted by defense counsel in response to Beeler's charge.  (*Id.*)  Although it appears that Norton is arguing that the mere existence of the position statement is evidence of an investigation, the statement itself provides no evidence as to any investigation into Beeler's allegations.  (*See* D.N. 41-6)  Moreover, Norton only contends that the statement is evidence of an investigation into Beeler's EEOC charge; it makes no mention of investigating Beeler's July 2016 or October 11, 2016 complaints.  (D.N. 44, PageID # 485)

leave from July 19, 2016, to October 10, 2016.  (*Id.*)  Norton responded to the Charge in a letter

dated December 20, 2016, arguing that it "did not discriminate against Beeler in any way."

(D.N. 41-6, PageID # 437-38)  Beeler filed this action against Norton in Jefferson Circuit Court

on August 25, 2017, alleging that Norton discriminated against her on the basis of age and gender

in violation of the KCRA, Title VII, and the ADEA.  (D.N. 1-1, PageID # 14)  Beeler also alleged

that Norton retaliated against her for her complaints to HR and the EEOC.  (*Id.*, PageID # 15)

Norton removed the action to this Court on the basis of federal-question jurisdiction.  (D.N. 1,

PageID # 2)  Norton now seeks summary judgment as to all of Beeler's claims against it. (D.N. 36)

## II.

Summary judgment is required when the moving party shows, using evidence in the record,

"that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a); *see* 56(c)(1).  For purposes of summary judgment, the

Court must view the evidence in the light most favorable to the nonmoving party.  *Loyd v. Saint

Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255 (1986)).  However, the Court "need consider only the cited materials."  Fed. R.

Civ. P. 56(c)(3); *see Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014).   If the

nonmoving party "fails to properly support an assertion of fact or fails to properly address another

party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed.  Fed. R.

Civ. P. 56(e)(2)-(3).  To survive a motion for summary judgment, the nonmoving party must

establish a genuine issue of material fact with respect to each element of each of her claims.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (noting that "a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial").

## A. Discrimination

### 1. Abandonment

Although Beeler makes claims of discrimination in her complaint (D.N. 1-1, PageID # 14), she did not mention these claims in her response to Norton's motion for summary judgment, except to state that she made a good-faith complaint of discrimination (D.N. 41, PageID # 398). "This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Larimer v. Grant*, No. 3:03CV664-S, 2006 U.S. Dist. LEXIS 49743, n.3 (W.D. Ky. July 17, 2016) (declaring claim abandoned where the plaintiff failed to address the claim in brief in opposition to defendant's motion for summary judgment but addressed other claims). Thus, given Beeler's failure to address or provide any support for her age- and gender-discrimination claims in response to Norton's motion for summary judgment, the Court concludes that Beeler has abandoned these claims. *See Bauer v. Cty. of Saginaw*, 111 F. Supp. 3d 767, 782 (E.D. Mich. 2015) (citing *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006)).

## B. Retaliation

### 1. Administrative Remedies

As a preliminary matter, Norton argues that Beeler cannot pursue her claim for retaliation because it was not included in her EEOC charge. (D.N. 36-1, PageID # 208) Beeler argues that the narrative included in her EEOC charge relayed that she believed the PIP was "nothing more than *retaliation* for [Beeler's] strong disagreement with [her] review and [Knapper's] treatment." (D.N. 41, PageID # 412) Beeler further notes that Norton did "not attempt to argue that the KCRA contains an exhaustion requirement, because it does not." (*Id.*, PageID # 413)

Exhaustion of administrative remedies is a precondition to filing a Title VII lawsuit however. *Lockett v. Potter*, 259 F. App'x 784, 786 (6th Cir. 2008) (citing *McFarland v. Henderson*, 307 F.3d 402, 406 (6th Cir. 2002); *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991)). "Thus, an employee alleging employment discrimination in violation of [Title VII] must first file an administrative charge with the EEOC within a certain time after the alleged or wrongful acts." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) (citing 42 U.S.C. § 2000e-5(e)(1)). The EEOC charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Id.* (citing 29 C.F.R. § 1601.12(b)). Thus, "[a]s a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *Id.* (citing 42 U.S.C. § 2000e-5(f)(1); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)).

### a. Narrative

The Sixth Circuit applies the "expected scope of the investigation test" to determine whether a plaintiff has exhausted her administrative remedies on a particular claim. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010). "The 'expected scope of the investigation test' requires a plaintiff to have alleged sufficient facts in his or her EEOC complaint to put the EEOC on notice of the other claim even though the plaintiff failed to check the appropriate box on the EEOC's complaint form." *Omabele v. Henry Ford Health Sys.*, No. 12-11938, 2015 U.S. Dist. LEXIS 124300, at *37-*38 (E.D. Mich. Aug. 20, 2015) (citing *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004)). "Under this test, where a plaintiff did not adequately identify a retaliation claim in the EEOC charge, a defendant may still have potential liability for retaliatory conduct where such liability could 'reasonably be expected to grow out of the EEOC

charge.'" *Id.* at *38 (quoting *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998)).

The Sixth Circuit has held that "[w]here the plaintiff alleged facts to the EEOC which clearly included retaliation allegations . . . such a plaintiff should not be precluded from bringing a retaliation claim in the complaint." *Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 833 (6th Cir. 1999); *see also Spengler*, 615 F.3d at 490 ("In a case such as this where a plaintiff clearly sets forth a retaliation claim in the narrative of the EEOC charge such that both the defendant and the EEOC were on notice of the plaintiff's retaliation claim, a broad reading of the EEOC charge is appropriate regardless of whether the plaintiff was represented by counsel when filing the charge."); c*f. Younis*, 610 F.3d at 363 (finding plaintiff's claim for retaliation failed because he did not check the box for retaliation and there was "nothing in the narrative portion of the EEOC charge that could be interpreted as claiming retaliation, nor is there any language that would have put the EEOC on notice that [the plaintiff] was alleging retaliation by [the defendant employer]"). Here, it is true that Beeler did not check the box for retaliation. (D.N. 41-7, PageID # 448) But the narrative portion of Beeler's EEOC charge clearly includes language sufficient to put Norton and the EEOC on notice of her retaliation claim. *See Spengler*, 615 F.3d at 490.

In her narrative, Beeler stated that she believed her PIP was "nothing more than *retaliation* for [her] strong disagreement with [her] review and Knapper's treatment." (D.N. 41-7, PageID # 452) (emphasis added) Moreover, Beeler provided the following facts in her narrative that could have put Norton and the EEOC on notice of a retaliation claim:

- Knapper marked Beeler's performance as unsatisfactory in a yearly review for 2015 even though he did not become her manager until the end of 2015;
- McCarthy called Beeler into his office and gave her a "hard time" about the comments she included in her yearly review after Knapper saw her working on something personal during her lunch hour;

- the Friday following Beeler's meeting with McCarthy, Knapper called her in to his office "to give [her] a hard time about a project that was moving along just fine as if it wasn't";
- Beeler then went to speak with Craig and the following Tuesday and was told to meet Knapper in Craig's office where Beeler was presented with the PIP;
- Knapper "went to [her] co-workers (took them aside) and told them not to talk to [her]" and told Beeler that she was only to speak with him;
- Knapper continued to rate Beeler as if she was not able to do her job, "when in fact [she was] doing [her] job and supporting the Storage systems as well as Networker";
- Knapper assigned Beeler projects in the PIP "that ha[d] taken years to get that way" meaning that there was "no way these projects [could] possibly be completed by one person in that time frame";
- Knapper kept complaining that Beeler was not documenting well enough "when in fact, [she was] documenting more than just about everyone else in the IS department";
- Knapper was purposely ignoring her emails and then complaining about Beeler's lack of responsiveness; and
- Beeler's statement that she was Knapper's "target."

(D.N. 41-7, PageID # 451-52)  As these facts clearly set forth retaliation allegations, Beeler will not be precluded at this stage from asserting this claim.  *Duggins*, 195 F.3d at 833.

### b.  EEOC Charge

Beeler also alleges that she was retaliated against for filing a complaint with the EEOC. (D.N. 41, PageID # 404-05)  "The Sixth Circuit has specifically held that 'it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge[] [because] the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court."  *Omabele*, 2015 U.S. Dist. LEXIS 124300, at *38 (quoting *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546-47 (6th Cir. 1991)).  This is because such "retaliation claims by definition[] arise after the filing of the EEOC charge, [and thus] this rule promotes efficiency by requiring only one filing."  *Ang*, 932 F.2d at 546-47.  In light of the above, the Court concludes that Beeler sufficiently exhausted her retaliation claims prior to filing this action.  *Spengler*, 615 F.3d at 490.

## 2. Prima Facie Case

In assessing claims of retaliation based on circumstantial evidence, courts apply the *McDonnell Douglas* burden-shifting analysis. *Stanley v. Insights Training Gr., LLC*, No. 3:09-cv-231, 2013 U.S. Dist. LEXIS 1428, at *18 (W.D. Ky. Jan. 4, 2013) (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009)). For a prima facie case of retaliation, Beeler must show that (1) she engaged in protected activity; (2) Norton knew of the protected activity; (3) Norton subsequently took an adverse employment action against her; and (4) "there was a causal connection between [Beeler's] protected activity and the adverse employment action." *Stevens v. St. Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013) (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008); *Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004)). For the reasons explained below, the Court finds that Beeler has established a prima facie case of retaliation.

### a. Adverse Employment Action

The "materially adverse action" element of a retaliation claim is "less onerous" to establish than the "adverse employment action" element of a discrimination claim. *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014). Thus, "[t]he antiretaliation provision, unlike the substantive [antidiscrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006). In the context of retaliation, therefore, a plaintiff need only show that "the employer's actions (are) harmful to the point they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Coventry Health*, No. 3:14-CV-645-CRS, 2015 U.S. Dist. LEXIS 147910, at *28 (W.D. Ky. Nov. 2, 2015) (quoting *Burlington Northern*, 548 U.S. at 57). As adverse actions, Beeler provides the following: (1) being placed on a PIP "that threatened

termination on its face"; (2) being isolated from assistance and being assigned an "impossibly high volume of work"; and (3) her subsequent termination.[4]  (D.N. 41, PageID # 407)  Norton does not dispute that these constitute adverse employment actions.  (*See* D.N. 36-1, PageID # 208-11; D.N. 44, PageID # 477-84)  Instead, Norton merely argues that such allegations "contain no cite to the record."  (D.N. 44, PageID # 481)  But it is undisputed that Beeler was placed on a PIP and that she was terminated.  (*See* D.N. 36-1, PageID # 196, 199)  Moreover, as will be discussed below, the Court finds that there is a genuine issue of material fact as to whether Beeler was given an "impossibly high volume of work."  Accordingly, for the purposes of the present motion, the Court finds that these constitute adverse employment actions.

### b.  Protected Activity

Next, Beeler must show that she engaged in a protected activity.  *Stevens*, 533 F. App'x at 631.  Protected activities include "participation in a Title VII proceeding [and] when an employee has otherwise opposed discrimination made unlawful under Title VII."  *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 331 (6th Cir. 2010).  Beeler relies on the opposition clause, arguing that her complaints to Craig about age and gender discrimination and her complaint to the EEOC constitute protected activity.  (D.N. 41, PageID # 405)  "The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices."  *Laster*, 746 F.3d at 730.  It "encompasses utilizing formal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."

---

[4] Beeler pointed to no evidence and made no further argument as to her claim that isolation constitutes an adverse employment action.  (*See* D.N. 41)  The Court "need only consider the cited materials," Fed. R. Civ. P. 56(c)(3), and Beeler has failed to properly support her assertion that she was isolated from her co-workers.  Accordingly, the Court finds no genuine issue of material fact as to whether Beeler was isolated.  Fed. R. Civ. P. 56(e)(2).

*Simmons v. A.I.M.C.O. Prop. Mgmt.*, No. 1:08 CV 0513, 2008 U.S. Dist. LEXIS 32587, at *13 (N.D. Ohio Apr. 21, 2008) (citing *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)). "Complaints cannot be "[v]ague charges of discrimination or that 'management is out to get the plaintiff,'" however. *Love v. Elec. Power Bd. of Chattanooga, EPB*, 392 F. App'x 405, 409 (6th Cir. 2010). Norton does not appear to contest that Beeler's complaint to Craig on October 11, 2016, or her claim to the EEOC constitutes protected activity. (*See* D.N. 36-1; D.N. 44)

Norton argues, however, that Beeler did not engage in any protected activity prior to being placed on the PIP on August 9, 2016. (D.N. 44, PageID # 478) Norton maintains that Beeler engaged in protected activity for the first time when she filed a complaint with the EEOC in September 2016 (D.N. 44, PageID # 478), and Craig stated that Beeler did not complain of being treated differently due to her age or gender until their last PIP follow-up meeting on October 11, 2016 (D.N. 36-5, PageID # 340). But Beeler stated in her deposition that she met with Craig "[j]ust before [she] got put on the personal improvement plan"; she believed the meeting was "[p]robably a month before" but was not exactly sure of the date. (D.N. 36-2, PageID # 251) Beeler testified that she told Craig at that meeting that she "thought [she] was being discriminated against" and that she "was being isolated [and] alienated" due to her age and gender. (*Id.*, PageID # 251-52, 256) Viewing the evidence in the light most favorable to Beeler, there is a genuine issue of material fact as to whether she brought a complaint of discrimination to Craig—i.e., whether Beeler engaged in protected activity before being placed on her PIP. *See New Breed Logistics*, 783 F.3d at 1067-68 ("If an employee demands that his/her supervisor stop engaging in this unlawful practice—i.e., resists or confronts the supervisor's unlawful harassment—the opposition clause's broad language confers protection to this conduct.").

### c. Knowledge of Protected Activity

In order to satisfy the knowledge prong of her prima facie retaliation case, Beeler must produce evidence sufficient to establish that the individuals who took the adverse employment action knew of her protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). In making this determination, the Court considers the knowledge and motive of those who were meaningfully involved in or influenced the decision to terminate. *See Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) ("[C]ourts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee."). Here, such individuals include Knapper and Craig.

Norton maintains that it had no knowledge of Beeler's EEOC charge prior to placing her on her PIP. (D.N. 36-1, PageID # 210) It also argues that Beeler did not complain to Craig about discrimination until after she was informed that she did not successfully complete her PIP. (D.N. 44, PageID # 479) Where "the decisionmaker denies having knowledge of the alleged protected activity, the plaintiff must do more than 'offer[] only conspiratorial theories . . . or flights of fancy, speculations, hunches, intuitions, or rumors.'" *Proffitt v. Metro Gov't of Nashville & Davidson Cty., Tenn.*, 150 F. App'x 439, 443 (6th Cir. 2005) (quoting *Mulhall*, 287 F.3d at 552 (internal quotation marks omitted)).

"An employee may survive summary judgment by producing either direct or circumstantial evidence to establish th[e] [knowledge] element of her claim." *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 909 (W.D. Ky. 2015) (citing *Proffitt*, 150 F. App'x at 442-43). Craig admitted knowledge of Beeler's October 11, 2016 complaint. (*See* D.N. 36-5, PageID # 340) Norton likewise does not deny knowledge of Beeler's EEOC charge; it merely disputes when it obtained such knowledge. (D.N. 44, PageID # 478-79) Therefore, the Court need only determine whether

there is circumstantial evidence sufficient to establish that Knapper knew of Beeler's alleged complaints to Craig in July 2016.

### i. Hearsay

In her affidavit, Beeler states that after the first time she brought complaints of discrimination to Craig, Facktor and Tinal informed her "that Knapper had talked to them and expressed that he was worried that [Beeler] had complained to Human Resources about him." (D.N. 41-2, PageID # 419)   Norton argues that Beeler cannot establish a prima facie case of retaliation by relying on inadmissible hearsay.  (D.N. 44, PageID # 482)

"On summary judgment, the Court may not consider inadmissible hearsay."  *Kaufman v. GE*, No. 3:16-CV-204-TBR, 2017 U.S. Dist. LEXIS 80924, at *13 (W.D. Ky. May 26, 2017) (citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003)).   Norton is incorrect in asserting that the statement presents "hearsay within hearsay," however.  (D.N. 44, PageID # 483) It is true that there are two levels to this statement: (1) Knapper speaking with Facktor and Tinal, and (2) Facktor and Tinal relaying to Beeler what Knapper had said.   But the first layer of the statement—Knapper's alleged comment to Facktor and Tinal—is not hearsay because it is not being offered for the truth of the matter asserted.   Instead, the statement would be used to demonstrate that Knapper knew Beeler had complained to HR.  (D.N. 41, PageID # 405)  Thus, Knapper's alleged statement to Facktor and Tinal is not hearsay.  *See Mich. First Credit Union v. CUMIS Ins. Society, Inc.*, 641 F.3d 240, 251 (6th Cir. 2011) (noting that statement is not hearsay if it is "not offered to prove the truth of the matter asserted, but to demonstrate [the speaker's] knowledge, or lack thereof").   Accordingly, the fact that Tinal and Facktor repeated Knapper's statement does not create hearsay within hearsay.  *See Wright v. Beard*, No. 1:14-CV-90-GNS-HBB, 2016 U.S. Dist. LEXIS 169572, at *7 n.1 (W.D. Ky. Dec. 8, 2016).

The Court must still determine whether the second layer of the statement—Facktor and Tinal repeating Knapper's comment to Beeler—constitutes hearsay. *See id.* at *6-*7 (finding the first layer of a statement was not hearsay and then determining whether repetition of that first-layer statement was hearsay). Beeler claims that she wants to use the statement to show that Knapper knew of her complaint to Craig before she was placed on the PIP. (D.N. 41, PageID # 405) But Beeler "did not hear [Knapper's] supposed statement to" Facktor and Tinal. *Wright*, 2016 U.S. Dist. LEXIS 169572, at *7. "The only proof on this point is [Facktor and Tinal's] recount to [Beeler]." *Id.* Thus, Beeler offers Facktor and Tinal's hearsay statement "as evidence that [Knapper] actually told [them]" that he was worried about Beeler's complaint to HR—"i.e., for the truth of the matter asserted." *Id.* As the second layer is hearsay and Beeler does not argue that any exception applies, the statement is inadmissible and not available for consideration by the Court. *Kaufman*, 2017 U.S. Dist. LEXIS 80924, at *13.

### ii.    Interaction of Individuals

The Court still finds, however, that a genuine issue of material fact exists as to Knapper's knowledge of Beeler's purported July 2016 complaints to Craig. A decisionmaker's "knowledge of a plaintiff's protected activity can be inferred from evidence from the prior interaction of individuals with such knowledge and those taking the adverse employment action." *Mulhall*, 287 F.3d at 553. "A reasonable jury could make this inference when the plaintiff produces evidence that such prior interactions make it 'highly improbable' that the individual who knew of the plaintiff's protected activity did not share this information with the second individual who actually took the adverse employment action as soon as the first individual obtained the information." *Garrett v. Mercedes-Benz Fin. Servs., USA LLC*, 331 F. Supp. 3d 699, 715 (E.D. Mich. 2018) (citing *Mulhall*, 287 F.3d at 553 (citation omitted)). Viewing the evidence in the light most

favorable to Beeler, a reasonable jury could find that it is highly improbable that Craig did not share any July 2016 complaint with Knapper.

The Court has previously determined that there is a genuine issue of material fact as to whether Beeler complained to Craig in July 2016. If Beeler complained to Craig at that time, then Craig had knowledge of this protected activity. And Knapper and Craig had many interactions regarding Beeler's discipline: Knapper consulted Craig in both the decision to place Beeler on a PIP and the decision to place Beeler on job-placement leave. (D.N. 36-5, PageID # 340)

The Sixth Circuit in *Mulhall*, 287 F.3d at 543, considered a case similar to this one. The Sixth Circuit explained that in *Kralowec v. Prince George's Cty., Maryland*, 503 F. Supp. 985 (D. Md. 1980), the District of Maryland found "that the plaintiff had met her burden where she produced evidence that one county official knew of the plaintiff's complaint and that the 'prior interaction' of that first official with the second official, who actually fired the plaintiff, made it 'highly improbable . . . that [the first official] would not have discussed plaintiff's complaint with [the second official] as soon as [the first official] obtained this information.'" *Id.* at 553 (quoting *Kralowec*, 503 F. Supp. at 1010). The Sixth Circuit distinguished *Kralowec* from the facts before it, noting that in *Kralowec*, "the first official actually participated in drafting the charges against the plaintiff that resulted in her discharge." *Id.* (citing *Kralowec*, 503 F. Supp. at 1009). The Sixth Circuit said that "[g]iven th[e] level of involvement by an official with knowledge of the protected activity . . . the inference that the official who actually decided to fire the plaintiff [had knowledge of the complaint] was eminently reasonable" in *Kralowec*. *Id.*

The present case is factually similar to *Kralowec*. As explained above, there is a genuine issue of material fact here as to whether the "first official"—Craig—was aware of Beeler's complaint. *See Kralowec*, 503 F. Supp. at 1009-10. Further, as in *Kralowec*, where the first official

participated in drafting the charges against the plaintiff that resulted in her discharge, Craig was consulted on the decision to place Beeler on a PIP. *Id.* at 1009. (D.N. 36-5, PageID # 340) Given the level of Craig's involvement, the inference that Knapper had knowledge of any complaint Beeler made to Craig is reasonable. *See Mulhall*, 287 F.3d at 553. Therefore, a genuine issue of material fact exists as to whether Knapper also knew of Beeler's purported July 2016 complaints to Craig. *See Garrett*, 331 F. Supp. 3d at 715.

### d.  Causal Connection

For the fourth prong, Beeler must show a causal connection between the protected activity and the adverse employment action. *Scott v. Metropolitan Health Corp.*, 234 F. App'x 341, 347 (6th Cir. 2007) (citing *Balmer v. HCA, Inc.*, 423 F.3d 606, 613-14 (6th Cir. 2005)). To establish the necessary causal connection, a plaintiff must present proof that "the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made." *Brooks*, 132 S.W.3d at 804. The Court must therefore determine whether there is a causal connection between the protected activities of which there was knowledge— Beeler's July 2016 complaint, Beeler's October 11, 2016 complaint, and the EEOC charge—and the adverse employment actions suffered.

Beeler "must produce sufficient evidence 'from which an inference could be drawn that the adverse action would not have been taken had' [Beeler] not engaged in protected activity." *Wilkey v. Mgmt. & Training Corp.*, No. 4:15-CV-101-JHM, 2017 U.S. Dist. LEXIS 124155, at *7-*8 (W.D. Ky. Aug. 7, 2017) (citing *Nguyen v. City of Cleveland*, 229 F.2d 559, 563 (6th Cir. 2000); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* "Causation can be proven indirectly through circumstantial evidence

such as suspicious timing." *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 524-25 (6th Cir. 2008)).

### i. Placement on PIP

Contrary to Norton's arguments (D.N. 44, PageID # 480), the Sixth Circuit has found "that temporal proximity between an assertion of Title VII rights and a materially adverse action[] is sufficient to establish the causal connection element of a retaliation claim '[w]here an adverse employment action occurs *very close* in time after an employer learns of a protected activity.'" *Lindsay*, 578 F.3d at 418 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 532 (6th Cir. 2008)). But "the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causality." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (internal quotations and citation omitted).

As explained above, Beeler's affidavit testimony as to the timing of her first complaint to Craig will not be considered because it was inconsistent with her earlier deposition testimony. Beeler testified that her meeting with Craig happened "probably a month before" she was placed on her PIP. (D.N. 36-2, PageID # 251) The Sixth Circuit has found a time lapse of up to three months to be sufficient to satisfy the causal-connection element. *See, e.g.*, *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 501 (6th Cir. 2013) (holding that a temporal proximity of one month between the plaintiff's protected activity and adverse employment action was sufficient to establish a causal connection); *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (stating that three months was "significant enough to constitute sufficient evidence of a causal connection"). As Beeler testified that she brought her complaints to Craig one month prior to being placed on the PIP, there is sufficient temporal proximity to establish a causal connection.

*See Herrera*, 545 F. App'x at 501; *see also Luttrell v. Ford Motor Co.*, No. 3:16-cv-762-DJH-CHL, 2018 U.S. Dist. LEXIS 121662, at *22 (W.D. Ky. July 20, 2018) (finding that the two-month gap between the filing of the plaintiff's EEOC charge and his termination was sufficient to show causation).

### ii.    Termination

The same conclusion holds true for Beeler's ultimate termination. Norton argues that it did not receive notice of Beeler' EEOC charge until October 10, 2016, because the person to whom it was addressed was on leave at the time. (D.N. 36-1, PageID # 200; D.N. 36-3, PageID # 290) Craig admitted that Beeler complained of age and gender discrimination to her just a day later on October 11, 2016. (D.N. 36-5, PageID # 340) Beeler was then terminated on December 2, 2016, less than two months after her complaints to both the EEOC and to Craig. (D.N. 36-1, PageID # 199) Thus, there is also sufficient evidence of a causal connection to create a genuine issue of material fact as to whether Norton retaliated against Beeler for her EEOC charge and October 11 complaint. *See Dye*, 702 F.3d at 306.

### iii.    Intervening Legitimate Reason

The Sixth Circuit has "explained that even though close temporal proximity can support the causal element of a prima facie case of retaliation, an 'intervening legitimate reason to discipline' an employee can nevertheless defeat that inference." *Fletcher v. U.S. Renal Care*, 709 F. App'x 347, 353 (6th Cir. 2017) (citing *Wasek*, 682 F.3d at 472). Norton argues that "Beeler's continued failure to perform up to expectations constitutes an intervening legitimate reason for her placement on the PIP and her removal from her position[,]" defeating her attempt to establish her retaliation claims through temporal proximity. (D.N. 44, PageID # 481) Beeler allegedly met with Craig sometime in July 2016 (D.N. 36-2, PageID # 251-52) and was placed on her PIP on August

9, 2016 (D.N. 36-1, PageID # 251-52).  Norton points to no evidence that Beeler failed to improve between her July 2016 complaint and her placement on the PIP on August 9.

Moreover, Knapper stated in his declaration that he placed Beeler on the PIP because of her performance evaluation.  (D.N. 36-4, PageID # 297)  As determined above, there is a genuine issue of material fact as to whether Beeler's placement on the PIP was retaliation for her alleged July 2016 complaints.  Thus, any alleged lack of improvement cannot be an intervening event because it is part of the causal chain that began in July 2016.  *Cf. Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 628 (6th Cir. 2013) (rejecting temporal-proximity argument because "Kuhn's extended discretionary leave and his failure to return to work caused a shortage of available deputies in the Sheriff's Office and constituted an intervening reason for the County to terminate employment"); *Wright v. Cellular Sales Mgmt. Grp., LLC*, No. 19-5402, 2019 U.S App. LEXIS 36229, at *4-*5 (6th Cir. Dec. 6. 2019) (finding an intervening legitimate reason when the plaintiff "got into a public shouting match with a co-worker[]" between her complaint and her termination, and "company policy prohibited" that conduct); *Wasek*, 682 F.3d at 465-66 (finding intervening legitimate reason where plaintiff complained of sexual harassment but then plaintiff left the job site, creating difficulty for his employer).  Accordingly, the Court finds that Beeler's alleged failure to meet the PIP requirements does not constitute an "intervening legitimate reason" for placing her on the PIP and ultimately removing her from her position.

### 3.  Legitimate Nondiscriminatory Reason

Having determined that Beeler established a prima facie case of retaliation, the Court must examine whether Norton has offered legitimate reasons for placing Beeler on the PIP and terminating her employment.  *See Condiff v. Hart Cty. Sch. Dist.*, 770 F. Supp. 22 876, 884 (W.D. Ky. 2011).  "Once a plaintiff has established his or her prima facie case, the burden shifts to the

employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. If the employer articulates a legitimate, non-discriminatory reason for its action, the burden shifts to the plaintiff to come forward with admissible evidence showing that the employer's articulate[d] reason is just a pretext for unlawful discrimination." *Walton v. Best Buy Co.*, No. 2:08-cv-15084, 2010 U.S. Dist. LEXIS 83788, at *26 (E.D. Mich. Aug. 17, 2010). Norton states that it placed Beeler on a PIP because she failed to perform her job satisfactorily. (D.N. 36-1, PageID # 205) Norton says that it then removed Beeler from her position as Senior Storage Administrator and placed her on job-placement leave because she refused to perform certain tasks required by her PIP, missed deadlines, failed to communicate with her supervisor regarding tasks, and failed to demonstrate an understanding of technical skills. (*Id.*) Finally, Norton says that because Beeler failed to apply for another position, Norton terminated Beeler's employment at the end of her job-placement leave period. (D.N. 44, PageID # 484)

Job performance constitutes a legitimate, nondiscriminatory reason for an employment decision. *See Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 588 (6th Cir. 2002) ("Terminating an employee because he fails to perform satisfactorily is a legitimate and nondiscriminatory reason to end his employment"); *Cunningham v. Humana Ins. Co.*, 2011 U.S. Dist. LEXIS 98372, at *9 (W.D. Ky. Aug. 31, 2011) (finding that "an employee's failure to meet established performance standards . . . is certainly a legitimate business reason for termination" (citation omitted)). As to her termination, Norton provided Beeler with 60 days to find a new position within the company (D.N. 36-4, PageID # 298), and Beeler admitted that she did not apply for any other positions at Norton or for a transfer within the company (D.N. 36-2, PageID # 220). Thus, Norton has satisfied its burden to set forth legitimate, nondiscriminatory reasons for its decisions to place Beeler on a PIP, put her on job-placement leave, and ultimately terminate her from her position.

### 4. Pretext

Because Norton satisfied its burden of production as to its decisions to place Beeler on a PIP, put her on job-placement leave, and ultimately terminate her from her position, the burden now shifts back to Beeler to show that Norton's proffered reasons were pretext for retaliation. *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 599 (6th Cir. 2009) (citing *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004)). "To show pretext at the summary judgment stage, 'the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action].'" *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 610 (6th Cir. 2013) (quoting *Manzer v. Diamon Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis and internal quotation marks omitted)).

"Courts have recognized that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain . . . ." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). This makes "such factual determinations unsuitable for disposition at the summary judgment stage." *Id.* (citing *Lowe v. City of Monrovia*, 775 F.3d 998, 1009 (9th Cir. 1985) (stating that very little evidence is required to raise a genuine issue of fact regarding motive and concluding that summary judgment on the merits is ordinarily inappropriate once a prima facie case has been established)).

As evidence of pretext, Beeler argues that Norton failed to follow its own policies, particularly those related to termination; Norton's agents put her on a PIP that she could not reasonably complete; Norton separated her from her position before the end of the PIP; and Norton

offered no valid basis for failing to investigate or otherwise protect her in the wake of her protected activity. (D.N. 41, PageID # 409-12)

### a. Placement on PIP

As explained above, Norton said that it placed Beeler on the PIP because she failed to perform her job satisfactorily (D.N. 36-1, PageID # 205), with the goal of improving her performance (D.N. 44, PageID # 484).

"The first type of showing consists of evidence that the proffered basis never happened, that it is actually factually false." *Novotny v. Reed Elsevier*, No. C-3-05-424, 2007 U.S. Dist. LEXIS 66608, at *71 (S.D. Ohio Sept. 10, 2007). In this case, Beeler points to no evidence to show that the proffered basis for placing her on the PIP—unsatisfactory job performance—was factually false. *Id.* Under the second showing, "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Manzer*, 29 F.3d at 1084. The plaintiff then "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant . . . arguing that the sheer weight of the circumstantial evidence makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* "In other words, [Beeler] must argue that the sheer weight of the circumstantial evidence of retaliation makes it more likely than not that [Norton's] explanation is a pretext." *Novotny*, 2007 U.S. Dist. LEXIS 66608, at *72. The Court finds that Beeler has presented sufficient circumstantial evidence of pretext to meet her burden. *See DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393 (6th Cir. 2005) ("The Supreme Court has explained that . . . 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully

discriminated.'" (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 602 (6th Cir. 2001) (discussing *Reeves*))).

As mentioned above, Beeler allegedly complained to Craig in July 2016. (D.N. 36-2, PageID # 251-52) It is true that by that point, Beeler had already received written coaching regarding her unsatisfactory performance (D.N. 41-2, PageID # 418), and then received a performance evaluation for the 2015 period with an overall score of 53.82% shortly thereafter (D.N. 36-2, PageID # 268). But Beeler did not receive any written coaching from Knapper until May 31, 2016 (D.N. 44, PageID # 484) and the evaluation was not conducted until June 27, 2016 (D.N. 36-2, PageID # 263), despite the fact that the performance evaluation reflected that Beeler was not performing satisfactorily in 2015. Moreover, even though Beeler received her performance evaluation on June 27, 2016, she was not placed on the PIP until August 9. (D.N. 36-4, PageID # 297) Further, Beeler's PIP was not supposed to end until October 11, 2016 (D.N. 41, PageID # 401), and Knapper stated in his declaration that it was standard procedure to place employees who were rated as not meeting expectations on 60-day PIPs (D.N. 36-4, PageID # 297). Although Norton is correct that Beeler's final PIP assessment is dated October 11, 2016 (D.N. 44, PageID # 484), Norton admitted in its letter to the EEOC that Beeler's job-placement leave began on October 4, 2016—one week before the end of the PIP. (D.N. 41-6, PageID # 443) Norton has provided no explanation for its decision to put Beeler on job-placement leave a week early.

This time line suggests that Norton's proffered reasons are merely pretext. *See DeBoer*, 124 F. App'x at 393 (finding a demotion decision was suspiciously timed because the plaintiff announced her pregnancy at the end of August 2001 and the demotion decision was made two months later, even though defendants argued the decision to demote plaintiff had already been made two weeks prior to her request for paperwork). "[S]uspicious timing is a strong indicator of

pretext when accompanied by some other, independent evidence." *Id.* Like the plaintiff in *DeBoer*, Beeler has demonstrated suspicious timing and has produced other independent circumstantial evidence of pretext. In *DeBoer*, the Sixth Circuit found that although DeBoer's performance evaluation indicating that she needed improvement occurred many months before she announced her pregnancy, the defendants did not have a negative reaction to her allegedly poor supervisory skills until after she announced her pregnancy. *Id.* at 394. Similarly, here, although Knapper indicated in Beeler's performance evaluation in June 2016 that she needed improvement, he did not place her on the PIP until after she allegedly reported discrimination to Craig in July 2016.[5] Moreover, according to Norton, Knapper was working to improve Beeler's performance as early as December 2015, nearly eight months before placing her on the PIP. (D.N. 44, PageID # 480) While Norton maintains that "Beeler was already on a path toward a PIP long before any alleged protected activity" (*id.*), the fact that Knapper did not appear to be sufficiently troubled by Beeler's job performance to place her on a PIP until after she reported discrimination to Craig is likewise additional evidence which supports Beeler's claim of pretext. *DeBoer*, 124 F. App'x at 394.

>     **b.    Job-Placement Leave and Subsequent Termination**

Beeler also argues that Norton's proffered reasons did not motivate the removal of Beeler from her position or her subsequent termination. (D.N. 41, PageID # 409-12) Norton maintains

---

[5] As mentioned above, whether the performance evaluation occurred in June or July 2016 does not change the Court's analysis. Beeler testified that she met with Craig about a month prior to being placed on the PIP (D.N. 36-2, PageID # 251), while Norton stated that the performance evaluation happened on July 25, 2016—just over two weeks before Beeler was placed on her PIP (D.N. 36-1, PageID # 196) Based on that timeline, Knapper did not even rate Beeler's performance as unsatisfactory until after she brought her complaints to Craig. Accordingly, the Court would still find the timeline was suspicious, even if the Performance Evaluation did not occur until July 25, 2016.

that it removed Beeler from her position as Senior Storage Administrator and placed her on job-placement leave due to her failure to complete her PIP.  (D.N. 44, PageID # 484)  Norton claims that it then terminated Beeler's employment at the end of her job-placement leave period because Beeler failed to apply for another position within the company.  (*Id.*)  Beeler admits that she did not apply for another position at Norton.  (D.N. 36-2, PageID # 220)  She contends, however, that Norton's initial decision to put her on job-placement leave was pretextual.  (D.N. 41, PageID # 409-12)  The Court has already determined that Beeler has provided support for her argument that being placed on the PIP was pretextual.  Thus, because the job-placement leave followed from Beeler's failure to complete the PIP, it is also part of the pretextual chain of events that culminated in Beeler's termination.  Regardless, there is sufficient evidence to establish a genuine issue of material fact as to whether Beeler's job-placement leave was merely pretext for retaliation, and thus whether Beeler's ultimate termination was also pretext.

### i.    PIP Requirements

Beeler argues that "[a] basic examination of the weekly PIP requirements reveals that the PIP did not set forth expectations that an employee in Beeler's position could reasonably complete."  (D.N. 41, PageID # 409-10)  "When an employer imposes unreasonable expectations on an employee, the employer may be setting up a situation where the employee cannot help but fail."  *Dryanski v. Sloan Valve Co.*, No. 84 C 1396, 1986 U.S. Dist. LEXIS 26718, at *3 (N.D. Ill. Apr. 15, 1986).  "The employer may be trying to create a seemingly legitimate reason for firing the employee."  *Id.* at *3-*4.  "In this context, when the employer terminates the employee for the reason that the employee's performance is unsatisfactory, the employer's justification may be unworthy of belief."  *Id.* at *4.  "Thus when a question of fact exists as to whether an employer

has imposed unreasonable expectations on an employee, a question of fact exists as to whether the employer's justification, the employee's unsatisfactory performance, is a mere pretext." *Id.*

Norton has not addressed Beeler's argument as to her PIP requirements beyond stating that Beeler's argument is "based on her own uncorroborated allegations, which cannot, on their own, survive summary judgment." (D.N. 44, PageID # 485)  Contrary to Norton's argument, however, Beeler does not merely make a conclusory and uncorroborated allegation that the PIP's requirements were unreasonable.  Instead, Beeler provides in her sworn affidavit an example of a PIP requirement—the VNX Redesign Project—that she would be unable to complete in the time allotted.  (D.N. 41-2, PageID # 421)  Beeler explained the project as follows:

> The VNX Redesign described in the PIP was a project that was originally created for the entire Storage team to complete.  The reason for this project stemmed from two VNX Storage arrays (systems) that had been installed incorrectly.  The network cabling to the two Storage Area Network switches had not been configured the way they should have been[,] nor was the switch zoning for the host computers attached to the two VNX Storage arrays done correctly as a result of the incorrect cabling.  The installation was performed and completed by an outside vendor, EMC[,] and the Storage team[,] and it would have taken weeks to complete.  That was typical for this type of project.  Correcting the initial mistakes, though, including the re-cabling and rezoning of thousands of host computers, would take several months to complete.

(*Id.*)  Beeler further stated that she "did not have the time or team necessary to do the job," an issue that her management team "knew or should have known [about]."  (*Id.*)  Beeler explained that "[f]or a single person with daily tasks to complete . . . [she] found [her]self being constantly pulled away from the PIP project and found it impossible to complete such a project by [her]self."  (*Id.*)  Beeler said that she expressed this concern to Craig and Knapper but was told that she "could do it, and was expected to complete it."  (*Id.*)

Beeler's PIP included three pages of tasks to be completed within the 60-day time frame. (D.N. 36-2, PageID # 270-73)  Viewing the evidence in the light most favorable to Beeler, if the VNX Redesign project alone would have taken longer than 60 days to complete, then Beeler would

not have been able to finish the entire PIP in the time provided.  It is plausible that it would take a substantial amount of time to complete the VNX project, as Beeler stated in her affidavit that it took three parties several weeks to complete the initial installation, and the project was initially created for the entire Storage team to complete.  (D.N. 41-2, PageID # 421)  Moreover, Norton did not object to Beeler's characterization of the amount of work required for the VNX Redesign project and provided no evidence that the PIP requirements were reasonable or that an employee could complete the projects in the time frame allotted.  Thus, the Court finds that Beeler's allegations as to the PIP requirements support her claim of pretext.  *Cf. Goodman v. Eagle Alliance*, No. WDQ-08-3240, 2010 U.S. Dist. LEXIS 16478, at *21 (D. Md. Feb. 24, 2010) (finding the plaintiff's argument that his PIP set him up for failure to be "an unsubstantiated subjective belief" because he had weekly meetings to monitor his progress, he had been given an extension to complete the PIP on time, and the plaintiff cited no evidence that the reasons for firing him were a pretext for retaliation); *Lasisi v. Motorola, Inc.*, No. 04 C 7415, 2005 U.S. Dist. LEXIS 20195, at *13 (N.D. Ill. Sept. 14, 2005) (finding no issue of fact where the plaintiff provided no evidence that the goals set by his supervisor were unattainable and thus illegitimate expectations).[6]  Because Beeler has provided sufficient evidence of pretext, Norton's motion for summary judgment will be denied as to Beeler's retaliation claims.

---

[6] Beeler also argues that Norton provided no explanation for its failure to investigate her allegations before removing her from her position or terminating her employment.  (D.N. 41, PageID # 411-12)  Beeler maintains that Norton's policy entitled her to a fair investigation into her allegations, but that Norton can produce no evidence that it followed this policy.  (*Id.*, PageID # 411)  As the Court has already found evidence of pretext related to Beeler's job-placement leave and termination, it need not address these arguments.

**III.**

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)      Norton's motion for summary judgment (D.N. 36) is **GRANTED** as to Count I of the complaint and **DENIED** as to Count II.

(2)      This matter is referred to Magistrate Judge Regina S. Edwards for a status conference and all other purposes consistent with the original referral.  (*See* D.N. 7)